**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:19-CV-23803-JJO**

**JOHN WILLIAM HIGHFIELD, III,**
**Plaintiff,**

**v.**

**ANDREW SAUL,**
**Commissioner of,**
**Social Security Administration,**

**Defendant.**
_____/

## <u>ORDER</u>

THIS MATTER is before the Court on the Plaintiff's Motion for Summary

Judgment (DE# 23, 3/17/2020) and the Defendant's Motion for Summary Judgment

(DE# 24, 4/16/2020). The plaintiff requests the final decision of the Commissioner of

Social Security be vacated and this matter be remanded for further administrative

proceedings, including a *de novo* hearing and decision. The complaint was filed

pursuant to the Social Security Act ("SSA"), 42 U.S.C. § 405(g), and is properly before

the Court for judicial review of a final decision of the Commissioner of the SSA. The

parties consented to Magistrate Judge jurisdiction, (DE #21, 1/24/2020), and this matter

was reassigned to the undersigned pursuant to Judge Ungaro's Order dated January

27, 2020. (DE #22, 1/27/2020). Having carefully considered the filings and applicable

law, the undersigned enters the following Order.

## PROCEDURAL HISTORY

On May 20, 2016, John William Highfield, III ("the Plaintiff") filed a Title II application for a period of disability and disability insurance benefits. (Tr. 16)[1]. The plaintiff initially alleged an onset date of September 11, 2001, and claimed disability due to a lung disorder, acid reflux, and cancer. (Tr. 57-58, 67-68). The plaintiff's claim was initially denied on October 13, 2016. (Tr. 56-65). Upon reconsideration, the application was denied on May 11, 2017. (Tr. 67-76). On December 18, 2017, the plaintiff filed an application for Supplemental Security Income benefits. (Tr. 16). The plaintiff filed a request for a hearing on June 16, 2017. (Tr. 93-94). The plaintiff appeared and testified before an Administrative Law Judge ("ALJ") on September 7, 2018. (Tr. 29-53). At the hearing, the plaintiff amended his alleged onset date to June 17, 2015. (Tr. 33). The ALJ issued a finding of non-disability on October 3, 2018. (Tr. 13-15).

On October 29, 2018, the plaintiff filed a request for review of the ALJ's decision. (Tr. 147-149). The Appeals Council denied the request for review on July 11, 2019. (Tr. 1-3). The plaintiff has exhausted his administrative remedies and this case is ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3). The plaintiff filed the Plaintiff's Motion for Summary Judgment (DE# 23, 03/17/2020) on March 17, 2020. The defendant filed Defendant's Motion for Summary Judgment on April 16, 2020. (DE# 24, 04/16/2020). The defendant also filed the Defendant's Statement of Material Facts and Response to Plaintiff's "Statement of the Case" on April 16, 2020. (DE #26 4/16/2020). The plaintiff filed his reply on May 18, 2020. (DE# 27 5/18/2020).

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration. (DE #19, 1/17/20). The page numbers listed on this document refer to the bold numbers found in the lower right-hand corner of each page of transcript, as opposed to those assigned by the Court's electronic docking system or any other page numbers.

## FACTS

### I. The Plaintiff's Background

The plaintiff was born in 1962 and was 56 years old at the time of the ALJ's decision. (Tr. 16-24). The plaintiff completed four or more years of college. (Tr. 200). The plaintiff was a stock trader with a seat on the floor of the New York Stock Exchange. (Tr. 40). According to the plaintiff, he was in the World Trade Center on September 11, 2001, and "had to run for his life." (Tr. 241). The plaintiff was able to maintain his job with the New York Stock Exchange until 2008. (Tr. 40-41). Since then all of the plaintiff's jobs have been short lived. (Tr. 182). These jobs include working at Lowe's, Lyft, Uber, Sweetwater Pools, a Volvo dealership, and a pizza place. (Tr. 34-42). Initially, the plaintiff filed an application for Disability Insurance Benefits ("DIB") alleging disability beginning on September 11, 2001, due to a lung disorder, acid reflux, and cancer. (Tr. 57-58, 67-68). At the hearing, the plaintiff amended his onset date to June 17, 2015. (Tr. 33). The plaintiff testified that post-traumatic stress disorder, severe anxiety, and depression render him incapable of having a job. (Tr. 44).[2]

---

[2] It appears that the plaintiff completed an application for Supplemental Security Income on April 16, 2016, with his application for Disability Insurance Benefits. (Tr. 158). This application was likely denied due to resources (see Tr, 156), but no such denial can be found in the record. It is unclear when the Supplemental Security Income application considered by the ALJ was actually filed, as it is not contained in the record.

## II. Medical Evidence

A. <u>John R. Rowe, Jr., MD/East Cooper Family Practice/ Roper St. Francis</u>

On June 4, 2015, the plaintiff visited Roper St. Francis Physician Partners and saw physician assistant – certified ("PA-C"), Sarette Jenderny, for a hospital follow up. (Tr. 310). The plaintiff had a long history of alcohol abuse with intermittent periods of sobriety in attempts at rehabilitation. (<u>Id</u>.). The plaintiff was admitted to the hospital on May 30, 2015, and discharged on June 2, 2015. (<u>Id</u>.). On the day he was admitted the plaintiff decided to stop drinking, and did not have any alcohol that morning. (<u>Id</u>.). The plaintiff began experiencing spasms in his hands and severe shaking episodes while riding in the car with his family. (<u>Id</u>.). The plaintiff's family called the Emergency Medical Services (EMS) and the plaintiff was transported to the emergency room (ER). (<u>Id</u>.). The plaintiff was going through alcohol withdrawal, and the plaintiff was admitted to the Intensive Care Unit (ICU). (<u>Id</u>.). The plaintiff was treated by starting on Serax TID[3] with prn Atvian[4]. (<u>Id</u>.). The plaintiff's liver enzymes were elevated, consistent with alcohol induced liver injury. (<u>Id</u>.).

The plaintiff addressed his concerns about anxiety and depression with the medical professional and the plaintiff indicated that he believed anxiety and depression propel his drinking behavior. (Tr. 311.) The medical professional further noted that the plaintiff suffered from PTSD and had suppressed his symptoms for many years, but the plaintiff's depression/anxiety/drinking had become worse over the last decade. (<u>Id</u>.). The

---

[3] WebMD, *Serax Tablet*, www.webmd.com, *used to treat anxiety and also acute alcohol withdrawal*, https://www.webmd.com/drugs/2/drug-9495/serax-oral/details (last visited Jun. 30, 2020).

[4] WebMD, *Atvian*, www.webmd.com, *used to treat anxiety*, https://www.webmd.com/drugs/2/drug-6685/ativan-oral/details (last visited Jun. 30, 2020).

plaintiff was discharged on June 2, 2015, to a sober living house. (Tr. 310). At the June 4, 2015 visit, the plaintiff stated he felt better and stronger since being discharged and had not experienced any more uncontrollable shaking and/or spasms. (Id.). The plaintiff was attending AA, where he was to complete 90 meetings in 90 days and planned to complete a 12-step program. (Id.). At the same visit, the plaintiff indicated he thought he would benefit from maintenance medication for depression and anxiety. (Id.).

On June 17, 2015, the plaintiff had another 14-day hospital follow up and lab review. (Tr. 307). The plaintiff was suffering from anxiety and insomnia. (Id.). The plaintiff's physical examination was normal, the plaintiff was prescribed Celexa[5] for his anxiety, and the plaintiff's prescription for Trazodone[6] was refilled for insomnia. (Tr. 307-08). The plaintiff's cognitive exam was grossly normal. (Tr. 307).

On July 14, 2015, the plaintiff visited his primary care physician, Dr. Rowe, for a rash under both arms lasting one and one-half weeks and to address the plaintiff's concerns about his weight, which was 129 pounds. (Tr. 305). The plaintiff denied an alcohol screen and indicated he had not had a drink containing alcohol in the year prior. (Tr. 306).

On February 28, 2017, the plaintiff saw Dr. Rowe after an emergency room visit the prior day. (Tr. 426). The plaintiff was experiencing hypertensive urgency and severe muscle spasms and was treated with Atvian. (Tr. 426). The plaintiff's examination was

---

[5] **Celexa** (citalopram) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). **Celexa** is used to treat depression. **Celexa** may also be used for purposes not listed in this medication guide. https://www.drugs.com/celexa.html (last visited September 22, 2020).

[6] Trazodone is used to treat depression. It may help to improve your mood, appetite, and energy level as well as decrease anxiety and insomnia related to depression. Trazodone works by helping to restore the balance of a certain natural chemical (serotonin) in the brain. https://www.webmd.com/drugs/2/drug-11188/trazodone-oral/details (last visited September 22, 2020).

normal, and it was deemed the plaintiff was likely having withdrawal symptoms. (Id.). The plaintiff's cognitive exam was also grossly normal. (Id.). At the time, the plaintiff was taking Prilosec for heart burn, Metroprolol for high blood pressure and chest pain, and Lexapro for depression and generalized anxiety disorder. (Id.).

B. Lee Royall, MD – Charleston Gastro Specialists

The plaintiff began seeing Dr. Lee M. Royall, a gastroenterologist, on July 27, 2011. (Tr. 267). The notes indicate that the plaintiff had a history of alcohol abuse. (Id.). The plaintiff had recently been admitted to the ICU in a hospital for 16 days with apparent alcohol related cardiomyopathy. (Tr. 301). The plaintiff showed signs of anorexia, weight loss, and dysphagia of solids. (Tr. 267). Dr. Royall's notes mentioned the plaintiff was very resistant to outpatient programs such as Alcoholics Anonymous. (Tr. 301). The plaintiff denied any significant heartburn, reflux or chest pain. (Id.). Given the plaintiff's chronic alcohol use and in order to evaluate possible dysphagia, an endoscopy was recommended. (Tr. 267).

C. Retreat Premiere Addiction Treatment Center

On March 7, 2015, the plaintiff was admitted to a Retreat Premiere Addiction Center in Pennsylvania for the substance acute rehab program. (Tr. 239). The plaintiff noted alcohol as his primary substance type during the psychosocial clinical assessment and recorded an alcohol intake of over one pint daily. (Id.). The plaintiff admitted to drinking alcohol during 24 of the prior 30 days. (Id.). The plaintiff had been hospitalized previously that same week for drinking heavily and not eating properly. (Tr. 241). The plaintiff noted that he had high blood pressure and that his wife had given him many opportunities to get help. (Id.). The plaintiff had three children, two in college and

a nine-year-old, and alcohol affected his relationship with his children. (Id.). The plaintiff noted he was in the World Trade Center on September 11, 2001, and had to run for his life. (Id.).

The plaintiff stated that he had been self-employed for seven years as a stock trader, but that his work ethic suffers due to his alcohol use. (Tr. 244). The plaintiff experienced blackouts, tremors, and shakes due to alcohol addiction, and there was no evidence of a significant time in which the plaintiff was "clean." (Id.). The plaintiff was taking 25 mgs of Toprol[7] and noted he had moderate anxiety. (Tr. 244-245). The plaintiff presented evidence of chemical abuse or dependence and withdrawal like tremors, restlessness, perspiration, anxiety, and insomnia. (Tr. 249).

The plaintiff was discharged on April 6, 2015. (Tr. 255). The plaintiff's diagnosis at discharge was severe alcohol use disorder, unspecified depressive disorder, unspecified anxiety disorder, and narcissistic personality disorder. (Id.). Upon discharge, the plaintiff found it difficult to see the positive in life, and had difficulty letting go of past events. (Tr. 256). At the time of discharge, the plaintiff's prognosis was poor, and it was recommended the plaintiff go to 90 12-step meetings in 90 days and obtain a sponsor.

---

[7] WebMD, *Toprol XL*, www.webmd.com, *used to treat chest pain (angina), heart failure, and high blood pressure*, https://www.webmd.com/drugs/2/drug-9548/toprol-xl-oral/details (last visited Jun. 30, 2020).

(Tr. 256-257). The plaintiff's medications at the time of discharge included BuSpar[8], Magnesium Oxide[9], Metoprolol XL[10], Prilosec[11], and Remeron[12]. (Tr. 256).

D. <u>Joseph Dispenza, Psy. D.  – East Cooper Counseling and Psychological Services</u>

On March 29, 2016, the plaintiff saw Dr. Joseph R. Dispenza, a psychologist, after a referral by the World Trade Center Health Program. (Tr. 406-407). The plaintiff's main concern was getting help with his depression. (Tr. 407). The plaintiff noted having passive ideations about suicide. (Tr. 408). The plaintiff's wife left him 14 months prior but there was no set divorce date. (<u>Id</u>.). When the plaintiff was not working, he "hung" out alone. (Tr. 409). The last time the plaintiff was generally happy was 10-15 years prior. (<u>Id</u>.). The plaintiff noted that more than half the time he had thoughts that he would be better off dead or hurting himself in some way and that he had anxiety attacks in the prior four (4) weeks. (Tr. 410).

The plaintiff noted that his personal issues made it extremely difficult for him to do his work, take care of things at home, or get along with other people. (<u>Id</u>.). In a patient health questionnaire, the plaintiff indicated that he was bothered a lot by: (1)

---

[8] WebMD, *Buspar Tablet*, www.webmd.com, *used to treat anxiety*, https://www.webmd.com/drugs/2/drug-9036/buspar-oral/details (last visited Jun. 30, 2020).

[9] WebMD, *Magnesium Oxide*, www.webmd.com, *used to treat symptoms of too much stomach acid such as stomach upset, heartburn, and acid indigestion*, https://www.webmd.com/drugs/2/drug-3954/magnesium-oxide-oral/details (last visited Jun. 30, 2020).

[10] WebMD, *Metropolol Succinate*, www.webmd.com, *used to treat chest pain (angina), heart failure, and high blood pressure*, https://www.webmd.com/drugs/2/drug-8814/metoprolol-succinate-oral/details (last visited Jun. 30, 2020).

[11] WebMD, *Prilosec*, www.webmd.com, *used to treat certain stomach and esophagus problems (such as acid reflux, ulcers)*, https://www.webmd.com/drugs/2/drug-7957-1173/prilosec-oral/omeprazole-delayed-release-suspension/details (last visited Jun. 30, 2020).

[12] WebMD, *Remeron Tablet*, www.webmd.com, *used to treat depression*, https://www.webmd.com/drugs/2/drug-13707/remeron-oral/details (last visited Jun. 30, 2020).

stress at work outside of the home; and (2) financial problems or worries. (Tr. 411). The plaintiff noted that more than half of the time he had trouble concentrating on things, such as reading the newspaper or watching television. (Tr. 410). The plaintiff indicated that his problems made it extremely difficult to do his work, take care of things at home, or get along with other people. (Id.). The plaintiff further noted the most stressful thing in his life at that moment was September 11th and the loss of everything. (Tr. 411).

The plaintiff admitted to experiencing serious depression and anxiety on a daily basis. (Tr. 415). In his World Trade Center ("WTC") Health Program exposure form, the plaintiff noted he witnessed people being caught in the smoke during 9/11, the towers collapsing, and people jumping from towers. (Tr. 418). Following the assessment, the plaintiff was diagnosed with Chronic PTSD, Recurrent Major Depression Severe Type, and Panic Disorder. (Tr. 415). The doctor noted that the assessment lasted only 10 minutes but that the plaintiff should be referred to therapy. (Tr. 408). A significant portion of Dr. Dispenza's handwritten notes are illegible. (Tr. 408-409).

### III. State Agency Consultants

At both the initial and reconsideration level, the physicians employed by the State Disability Determination Services found insufficient evidence to evaluate the claimant's impairments. (Tr. 22, 62, 72). They were unable to assess any restriction of activity of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace, and repeated episodes of decompensation, each of extended duration due to insufficient evidence. (Tr. 62, 72). There was no Residual Functioning Capacity ("RFC") assessment at either the initial or the reconsideration level due to insufficient evidence. (Tr. 64, 74). There was no assessment of vocational

factors at either the initial or reconsideration level due to insufficient evidence. (Tr. 64, 74). Further, at both levels, the Psychiatric Review Technique ("PRT") was not sufficiently completed due to insufficient evidence. (Tr. 62-63, 72-73). Several attempts to contact the plaintiff were unsuccessful. (Tr. 70, 72-73). State Agency consultants found that no functional information was available to assess the severity of the plaintiff's allegations, therefore, there was insufficient evidence. (Tr. 73).

## IV. Hearing Testimony

A hearing was held before an Administrative Law Judge ("ALJ") on September 7, 2018. (Tr. 29). The plaintiff testified that he previously worked as a stock trader with a seat on the floor of the New York Stock Exchange. (Tr. 40). The plaintiff maintained that job until 2008. (Tr. 40). Since 2008 the plaintiff worked lower intensity jobs at Lowe's, Sweetwater pools, Volvo, and a pizza place. (Tr. 40-42). The plaintiff indicated that anxiety and depression contribute to him being unable to maintain a job and that he is unable to "hold it together." (Tr. 35). The plaintiff also testified that since his alleged disability onset date of June 17, 2015, he worked some jobs, but nothing of any real substance. (Tr. 34). At the time of the hearing, the plaintiff had a driver's license and drove. (Tr. 34). The plaintiff was also still married but had been separated for four years. (Tr. 34).

The plaintiff indicated that in a typical day he sits inside doing nothing or tries to help out with his daughters. (Tr. 40). The plaintiff does not like to go outside due to his depression and sometimes his depression and anxiety makes it too hard to pick up his daughter from school. (Tr. 43). The plaintiff noted anxiety, depression, and chest pain as physical limitations at the time of the hearing. (Tr. 36). The plaintiff testified that he

stopped drinking about two to three years prior to the hearing. (Tr. 37). The plaintiff

testified that he lived in a room he rented in a house and a couple other men lived there

also. (Tr. 39). The plaintiff mentioned that his treating physician recommended

counseling or mental health treatment, but he had not gone because he could not afford

it. (Id.). When asked by his attorney about his depression, anxiety, and panic attacks,

the plaintiff responded that he has the attacks both at home and when he is out. (Tr.

43). The plaintiff indicated that he has the attacks frequently at home but is unsure why.

(Tr. 44).

**V. Vocational Expert Testimony**

A vocational expert ("VE"), Tonetta Wattson-Coleman, testified at the ALJ

hearing. (Tr. 47-52). The VE classified the plaintiff's past job as a stock trader as having

a Specific Vocational Preparation ("SVP") of 6 and also as light per the Dictionary of

Occupational Titles ("DOT"). (Tr. 48). The ALJ noted during the VE's testimony that

because the plaintiff's other jobs were short-term, none were performed as substantial

gainful activity ("SGA") for a long enough time to be considered relevant. (Id.). The ALJ

posed the following hypothetical to the VE:

> Let's assume that a person of the Claimant's age, education,
> and work experience does not have any external limitations.
> Should have no exposure to work hazards; occasional
> changes in work setting and procedure; and no production
> pace-rate work, with the underlying theme essentially
> avoiding work stress. Would I be correct, then that would
> preclude stock trading?

(Id.).

In response to the ALJ's hypothetical, the VE indicated that stock trading would

be precluded. (Id.). The ALJ then asked if there were any other jobs that would fit within

those limits. (Id.). The VE testified that the other occupations that the hypothetical

claimant could perform, include a laboratory equipment cleaner, merchandise deliverer, usher, and dealer accounts investigator, all with an SVP of 2. (Tr. 48-49). The ALJ added the following limitation to his hypothetical:

> hypothetical worker could concentrate in two-hour increments to perform simple, repetitive tasks, would all those same jobs and same numbers apply because they were all SVP 2s?

(Tr. 49).

The VE responded in the affirmative. (Id.). The ALJ then further posed the question, "if I assume a greater concentration deficit that my hypothetical worker is going to be off task 20% of the day, are there jobs consistent with that degree of inattention?" (Id.). The VE responded "No, Your Honor. That hypothetical worker would not be able to retain or maintain employment." (Id.).

Following the ALJ's questioning, the plaintiff's attorney posed the following hypothetical to the VE:

> if we were to assume this hypothetical individual would be able to stay on-task when at work, but would miss three days of work out of the month on a consistent basis, how would that impact their ability to maintain employment with that level of absenteeism?

(Tr. 50).

In response to that hypothetical, the VE indicated that his hypothetical claimant would not be able to maintain employment. (Id.).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months." 42 U.S.C §§ 416(I); 423(d)(1); 20 C.F.R. § 404.905. The

impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . .." 42 U.S.C § 423(d)(1); 20 C.F.R. §§ 404.905-404.911.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 404.1520(a)-(f). The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity (SGA). 20 C.F.R. § 404.1520(a)(4)(i). If so, a finding of non-disability is made, and the inquiry ends. Id.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the plaintiff does not, then a finding of non-disability is made, and the inquiry ends. Id.

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R.§ 404.1520(d), Subpart P, Appendix I. 20 C.F.R. § 404.1520(a)(4)(iii). Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulation requires a finding of disability without further inquiry into the plaintiff's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). RFC is defined as "what you can do despite your limitations. 20

C.F.R. § 404.1545(a)(1). This determination takes into account "all relevant evidence," including medical evidence, the claimant's own testimony and the observations of others. Id. If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e); *See Barnes v. Sullivan*, 932 F.2d 1357, 1459 (11th Cir. 1991) (holding the claimant bears the initial burden of proving that he is unable to perform pervious work).

Fifth, the ALJ must determine whether the plaintiff is able to do any other work. The ALJ must consider the plaintiff's RFC, age, education, and work experience and determine if the plaintiff can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work, the ALJ will find them not disabled. Id. If the claimant cannot make an adjustment to other work, the ALJ will find them disabled. Id.

## THE ALJ'S FINDINGS

On October 3, 2018, the ALJ found that the plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 24). In addition, the ALJ found that the plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. (Id.). At step one, the ALJ found that the plaintiff met the insured status requirements of the Social Security Act through March 31, 2020, and the ALJ determined the plaintiff had not engaged in substantial gainful activity since June 17, 2015, the amended alleged onset date. (Tr. 18).

At step two, the ALJ found that the plaintiff had the following severe impairments: substance abuse disorder and post-traumatic stress disorder (PTSD). (Id.). The ALJ found that the plaintiff's impairments significantly limited his ability to perform basic work activities. (Tr. 19). The ALJ found no evidence in the record to support the alleged disability due to lung disorder, cancer, and acid reflux. (Id.). The record did reveal the claimant suffered from hypertension, hyperlipidemia, allergic rhinitis, glaucoma, and asthma; however, treatment notes showed that symptoms were controlled with medication. (Id.). Therefore, the ALJ found those impairments were "non severe." (Id.). Further, the ALJ noted that treatment records reflected a history of alcohol induced cardiomyopathy. (Id.). However, it was treated before the amended alleged onset date. (Id.).

At step three, the ALJ found that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 4041526, 416.920(d), 416.925 and 416.926). (Id.). The ALJ found that the severity of the claimant's mental impairments does not meet or medically equal the criteria of listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders, and 12.15 (trauma-and stressor-related disorders). (Id.). In making the aforementioned finding the ALJ considered whether the "paragraph B" criteria were satisfied. (Id.). In order to satisfy the "paragraph B" criteria, "the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information;

interacting with others; concentrating, persisting or maintaining pace; or adapting or managing themselves. (Id.).

A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. (Id.). An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis. (Id.). The ALJ found a moderate limitation in understanding, remembering, or applying information, and with regard to concentrating, persisting, or maintaining pace. (Id.). The ALJ also found a mild limitation in interaction with others. (Tr. 20). The ALJ found that the plaintiff has a moderate limitation in adapting or managing himself. (Id.). The ALJ found that, "because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." (Id.). The ALJ assessed whether the "paragraph C" criteria were satisfied and noted that the evidence failed to establish the presence of "paragraph C" criteria. (Id.).

Before considering step four, the ALJ found that the plaintiff:

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant should have no exposure to work hazards, but can concentrate in two hour increments to perform simple, routine, repetitive tasks with only occasionally changes in work setting or procedure and no production pace rate work requirements.

(Id.).

The ALJ found the plaintiff's

> medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> As for the claimant's statements about the intensity,
> persistence, and limiting effects of his symptoms, they are
> inconsistent with his reports to his treating physicians and with
> his activities of daily living.

(Tr. 21).

The ALJ found that although the plaintiff testified that he had cancer removed from his stomach, there was no evidence to support that in the record. (Id.). The plaintiff had also testified to having stopped drinking about two or three years prior to the ALJ hearing held in September 2018, and only drinking for a short period of time after his wife left. (Id.). However, the ALJ noted that the medical evidence shows the plaintiff had a history of alcohol abuse and was even admitted to the hospital in 2011 with alcohol induced cardiomyopathy, and underwent a one month long rehabilitation admission in March 2016. (Id.). Further, the plaintiff testified to having stopped drinking two to three years before the hearing held on September 7, 2018, but was admitted to the emergency room in March 2017 with hypertensive urgency and severe muscle spasms that were deemed to be withdrawal symptoms. (Id.). The ALJ noted that the lack of treatment for his mental impairments weakens his allegation of the severity of the impairments like his PTSD. (Tr. 22). The ALJ did find that the medical evidence supported a finding that the plaintiff's substance abuse and PTSD are severe impairments. (Id.). The ALJ noted that the plaintiff's only recent treatment was for hypertension and alcohol. (Id.). The ALJ further noted that the plaintiff alleged PTSD but had no prior history of PTSD and no PTSD treatment at the time of the hearing. (Id.).

At step four, the ALJ found that the plaintiff does not have the RFC to perform the requirements of past relevant work. (Id.).

At step five, the ALJ determined, after "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 24). In making that determination, the ALJ relied on the testimony of the VE, which the ALJ found was consistent with the information contained in the DOT. (Id.). The ALJ ultimately made "a finding of 'not disabled' under the framework of section 204.00 in the Medical-Vocational Guidelines." (Id.).

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, the Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); see Wolfe v. Chater, 86 F. 3d 1072,1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute their discretion). On judicial review, decisions made by the Commissioner of Social Security are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g) (2006); See Kelley v. Apfel, 185 F. 3d 1211,1213 (11th Cir. 1999). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. See Miles v. Charter, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account

evidence favorable as well as unfavorable to the decision." <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact, no presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. <u>See</u> <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145-11456 (11th Cir. 1991) (holding "Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord*, <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).

The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. <u>See</u> <u>Davis v. Shalala</u>, 985 F. 2d 528, 531 (11th Cir. 1993). The court may not, however, decide the facts anew, reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. <u>See</u> <u>Miles</u>, 84 F.3d at 1400; <u>See also</u> <u>Baker v. Sullivan</u>, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. <u>See</u> <u>Martin</u>, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. (<u>Id</u>.).

## <u>LEGAL ANALYSIS</u>

The plaintiff asserts that the ALJ's RFC determination that he can perform simple, routine, repetitive tasks with no production pace rate, occasional changes, and no exposure to hazards is not supported by substantial evidence. (Pl.'s Motion for

Summ. J. at 6). The plaintiff asserts the ALJ made an error when he found that the plaintiff had a severe mental impairment and continued to assess limitations in the RFC. Id. The plaintiff contends that the ALJ failed to fully develop the record because there is no medical opinion regarding the plaintiff's mental limitations in the record to support his RFC determination. (Pl.'s Motion for Summ. J. at 6). The plaintiff seeks a remand and to have the ALJ fully and fairly develop the record by obtaining a consultative examination or re-contacting Dr. Rowe for further information. (Pl.'s Motion for Summ. J. at 7-8). The undersigned finds that the ALJ's findings are not supported by substantial evidence and a remand is warranted.

**The ALJ Failed to Fully and Fairly Develop the Record**

It is well settled that even if plaintiff is represented by counsel, the ALJ has a basic obligation to develop full and fair record. Cowart v. Schweiker, 622 F. 2d 731, 735 (11th Cir. 1981) (citing Thorne v. Califano, 607 F. 2d 218, 219 (8th Cir. 1979)). Generally, where there is any conflict, inconsistency, ambiguity or insufficiency in the evidence, the ALJ is required to order a consultative examination to fully and fairly develop the record. See Cox v. Astrue, 933 F. 2d 169, 177 (N.D. N.Y. 2012). However, the burden is on the claimant to prove he is disabled. See 20 C.F.R. § 404.1512(a).

An ALJ's duty to develop the record includes making "every reasonable effort" to recontact the treating source "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record." SSR 96-5p, 1996 WL 374183, at *6 (July 2, 1996). In evaluating the necessity to remand a claim for further development of the record, one must show that "the record reveals evidentiary gaps

which result in unfairness or 'clear prejudice.'" <u>See</u> <u>Brown v. Shalala</u>, 44 F. 3d 931, 935 (11th Cir. 1995).

The record contains objective medical evidence demonstrating the presence of mental impairments. The plaintiff alleged disability based on lung disorder, acid reflux, and cancer. (Tr. 19, 58, 68). The ALJ found that the plaintiff had not been assessed with lung disorder and his lung exams were consistently normal. (Tr. 19). The ALJ noted the plaintiff had not reported any symptoms of acid reflux since the amended alleged onset date and there was no testimony to support this allegation. (<u>Id</u>.). Lastly, the ALJ noted the record contained no evidence of a diagnosis of cancer and it was not a medically determinable impairment. (<u>Id</u>.). However, at step two the ALJ found that the plaintiff's severe impairments included substance abuse disorder and post-traumatic stress disorder, which "significantly limit the ability to perform basic work activities." (Tr. 18-19); 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ then found that the plaintiff could perform a full range of work but had limitations based on his mental impairments. (Tr. 20). Specifically, the ALJ found that the plaintiff,

> should have no exposure to work hazards, but can concentrate in two hour increments to perform simple, routine, repetitive tasks with only occasionally changes in work setting or procedure and no production pace rate work requirements.

(<u>Id</u>.).

At step four, in order for the ALJ to determine if the plaintiff was able to perform his past relevant work, the ALJ was required to assess the plaintiff's RFC. (Tr. 17-18). <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv). RFC is the most the claimant can do despite his/her limitations. 20 C.F.R. § 416.945(a)(1). The RFC is based on an evaluation of the relevant evidence in the record. <u>See</u> 20 C.F.R. §§ 416.945(a)(3), 404.1520(a)(3),

404.1520(e), 404.1545(a)(1), (a)(3). At the ALJ hearing level, the ALJ is responsible for assessing the plaintiff's RFC. 20 C.F.R. § 404.1546(c).

Despite the objective medical evidence substantiating the presence of a mental impairment, the record does not contain (1) any medical opinion; (2) mental RFC assessment or; (3) Psychiatric Review Technique ("PRT") assessment relating to the plaintiff's mental impairments. The Commissioner of Social Security sought opinions from state agency consultants at both the initial and reconsideration level, however, those doctors indicated there was insufficient evidence to prepare a PRT or RFC regarding the plaintiff's vocational limitations. (Tr. 22, 62, 72). The ALJ did mention that "as to claimant's PSTD, and previously reported depression and anxiety, he indicates all were related to his experience of the events of 9/11 when he was in the World Trade Center." (Tr. 21).

The ALJ found that the record did not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even had limitations greater than those determined in this decision. (Tr. 22). However, without any medical opinions to guide the ALJ's RFC determination based on the plaintiff's mental impairments, the ALJ incorrectly crafted his own limitations. Specifically, that the plaintiff was able to concentrate in two-hour increments with occasional changes in work setting or procedure. (Tr. 20). See Williams v. Commissioner of Social Security, 366 F. 3d 411, 415 (2019). (holding the ALJ erred by failing to obtain any opinion evidence from an acceptable medical source, and decided the RFC based on his own interpretation of the medical record); See Spackman v. Colvin, 2:14-CV-04125-NKL, 2015 WL 518564, at *4 (W.D. Mo. February 9, 2015) (reversing and remanding in light of the inconclusive

medical evidence in the record, the ALJ could not accurately assess Spackman's RFC without acquiring additional medical opinions regarding Spackman's functional capacity).

In his decision, the ALJ noted at the end of step four that the plaintiff, "now alleges PTSD, though he has no prior history of those complaints and no current treatment." (Tr. 22). The hearing took place on September 7, 2018. (Tr. 29). However, when the plaintiff went to see Sarette Jenderny, PA-C for a hospital follow-up on June 4, 2015, she noted "Pt (patient) was in World Trade Center during 9/11 terrorist attack. Suffers from PTSD. Suppressed a lot of his Sx (symptoms) for many years, but depression/anxiety/drinking have worsened over the last decade." (Tr. 311). There was no mention of this allegation of PTSD in the ALJ's decision. Also, when the plaintiff met with Dr. Joseph Dispenza on March 29, 2016, the plaintiff was diagnosed with major depressive disorder, anxiety disorder, and post-traumatic stress disorder. (Tr. 408). In his Brief Patient Health Questionnaire, the plaintiff noted that more than half the days he has trouble concentrating on things, such as reading the newspaper or watching television. (Tr. 410). When asked how difficult his problems make it for him to do his work, take care of things at home, or get along with other people, the plaintiff marked the box "extremely difficult." (Tr. 410).

Dr. Dispenza's medical notes are marked as Exhibit 4F. Even in light of the diagnosis by Dr. Joseph Dispenza, the ALJ referenced Exhibit 4F in only two sentences of his entire decision. (Tr. 21-22). In consideration of the diagnosis, the ALJ should have inquired further regarding the plaintiff's work limitations in light of his mental health. See Fern v. Comm'n of Soc. Sec., 1:18-CV-1297-TPK, 2019 WL, at *3-4 5853859 (W.D.N.Y.

23

Nov. 7, 2019) (remanding the ALJ's decision because the record is devoid of any medical report as to the plaintiff's functional capacities, and therefore, the ALJ had no basis for crafting an RFC). During the ALJ hearing, the plaintiff testified to having panic attacks maybe once or twice a week. (Tr. 37). Also, the plaintiff mentioned that his treating physician had recommended counseling or mental health treatment, but the plaintiff had not gone because he could not afford it. (Tr. 37). This is supported by Exhibit 7D, which shows a significant decrease in the plaintiff's yearly earnings over time. (Tr. 182). When asked by his attorney about his depression, anxiety, and panic attacks, the plaintiff responded that he has these attacks both at home and when he is out. (Tr. 43). The plaintiff indicated that the attacks occur frequently, but he is unsure as to what triggers them. (Tr. 44).

The defendant relies on Castle v. Colvin, 577 F. App'x 849, 853-54 (11th Cir. 2014), and Green v. Soc. Sec. Admin, 233 F. App'x 915, 923-24 (11th Cir. 2007) in support of his position that there is substantial evidence to support the ALJ's RFC determination. (Def.'s Motion for Summ. J. at 5). Further, the defendant argues that ALJ did not need to obtain an opinion regarding the plaintiff's functional limitations from a consultative examiner, medical expert, or any other doctor. (Def.'s Motion for Summ. J. at 7).

In Castle, the plaintiff had a doctor who completed a physical RFC assessment and opined that Mr. Castle's pain frequently interfered with this attention and concentration and that even working a less stress job would be problematic. Castle, at 850-51. In addition, there was a function report completed by Mr. Castle himself where he noted that he shopped, prepared meals, drove, mowed his law, attended church,

walked, and did laundry. <u>Castle</u>, at 851. The ALJ found that the plaintiff had severe impairments of obesity and knee arthritis. <u>Id</u>. The ALJ went on to determine Mr. Castle's RFC was,

> Less than a full range of medium work, and that Mr. Castle could (1) frequently lift 25 pounds; (2) occasionally lift 50 pounds; (3) stand, walk, and sit for 6 hours; (4) frequently push and pull with his lower extremities, as well as balance, stoop, and crouch; and (5) occasionally climb, kneel, and crawl.

<u>Id</u>.

In <u>Castle</u>, the court found that the district court erred in concluding that "substantial evidence did not support the ALJ's RFC finding, that the ALJ's findings should have been underpinned by a medical source opinion, and that the ALJ was not qualified to interpret Mr. Castle's straightforward medical record." <u>Castle</u>, at 854. In this matter, however, there was no RFC assessment prior to the ALJ's, and no function report completed by the plaintiff himself, that would have helped guide the ALJ's RFC determination. In addition, unlike in <u>Castle</u>, in the instant case, there is no medical opinion assessing limitations on the plaintiff's ability to work. Further, there was no RFC assessment at the initial or reconsideration level completed by the state agencies in this matter.

In <u>Green</u>, the plaintiff alleged disability due to chronic obstructive pulmonary disease ("COPD"), tendonitis, back problems, anxiety, and depression. <u>Green</u>, at 918. The plaintiff was diagnosed by her doctor with COPD, tendinitis in her forearms, hypertension, and osteoarthritis at multiple sites, and the doctor instructed Green to continue over-the-counter pain relief. <u>Green</u>, at 919. The doctor in <u>Green</u> completed a

Physical Capacities Evaluation, a Clinical Assessment of Pain, and a Clinical

Assessment of Fatigue/Weakness. Id. The Green doctor concluded that the plaintiff

> Could lift five pounds or less occasionally, sit for two hours, and walk or stand for two hours during each eight-hour workday. He determined that she could not work around hazardous machinery or dust, allergens, or fumes.

Id.

The ALJ in Green found that the medical evidence did not support the limitations

imposed by the doctor. Green, at 921. In Green the ALJ also found

> 'that [Green] is limited to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds;'
>
> 'in an eight-hour workday, she can stand and/or walk six hour and sit six hours;'
>
> '[s]he experiences moderate fatigue with its moderate effect on her ability to concentrate, and requires a temperature and humidity controlled environment, free of dust, fumes, and gasses.'

Id.

In Green, the ALJ afforded no weight to one of the doctor's (Dr. Bryant's) opinion

of the claimant's limitations. Id. The only documentary evidence that remained in the

Green case was the office visit records from Dr. Bryant and Dr. Ross that indicated "she

was managing respiration problems well, that she had controlled her hypertension, and

that her pain could be treated with over-the-counter medication." Green, at 923-24. In

this matter, there is no evidence that the plaintiff's PTSD was being controlled by

medication. In addition, here, there is no information in the record as to how the

plaintiff's PTSD would limit his ability to work on a daily basis.

The plaintiff relies on Sanchez v. Berryhill, 1:17-CV-163-GRJ, 2018 WL 7351685

(N.D. Fla. June 29, 2018), in support of his argument that the ALJ failed to fully and

fairly develop the record. In <u>Sanchez</u>, the plaintiff noted that even though the record contained "objective medical evidence substantiating the presence of a mental impairment, the record does not contain any medical opinion, mental residual capacity assessment, or Psychiatric Review Technique ("PRT") assessment relating to plaintiff's mental impairments." <u>Sanchez</u>, at *9. In addition, similar to this matter, in <u>Sanchez</u>, there was no opinion evidence by the state agency physicians or psychologists and there was "insufficient evidence" in the file to prepare a PRT or determine Sanchez's functional limitations. <u>Sanchez</u>, at *5. Generally, "where there is any conflict… or insufficiency in the evidence, the ALJ is required to order a consultative examination to fully and fairly develop the record." <u>See</u> <u>Cox</u> at 177; 20 C.F.R. §§ 404.1519a(b), 416.920b(b).

In <u>Sanchez</u> the Court decided that "in the absence of any mental status assessment, the ALJ had a duty to order a consultative mental status examination to assess the severity of Plaintiff's depressive disorder." <u>Sanchez</u>, at *5. The Court further noted that,

> instead- without the benefit of a medical opinion- the ALJ improperly made his own independent psychiatric medical findings regarding the limitations that Plaintiff's mental impairments had on his ability to perform work-related activities.

<u>Sanchez</u>, at *10.

This is very similar to what the ALJ did in the instant case. There is evidence of PTSD dating back to 2015. (Tr. 311). In June 2015, the plaintiff addressed concerns about anxiety and depression with physician assistant Sarette Jenderny.  There is further evidence of this mental diagnosis in 2016 during the plaintiff's visit with Dr.

Dispenza. (Tr. 408). The ALJ did not acknowledge these facts and indicated that the plaintiff was alleging PTSD despite no prior history of PTSD. (Tr. 22). The record reflects otherwise. Here, as in <u>Sanchez</u>, at both the initial and reconsideration level, state agency physicians and psychiatrists were unable to complete an RFC or PRT due to insufficient evidence. (Tr. 62-64, 72-74). The attempts made to get more information from the plaintiff were unsuccessful. (Tr. 63, 70, 73). However, there is no evidence in the record that attempts were made to contact the plaintiff's doctors directly instead of contacting the plaintiff. The ALJ should have gotten additional information from Dr. Rowe regarding the plaintiff's limitations due to his diagnosis of PTSD, and should have ordered a consultative exam.

The undersigned finds that there is insufficient evidence to support the ALJ's finding that, while the plaintiff does have some limitations, the plaintiff is able to do a full range of work. Further, this court finds that the lack of evidence to support the RFC determination comes from insufficient evidence and therefore, creates a gap in the evidence that ultimately prejudiced the plaintiff.

## <u>CONCLUSION AND RULING</u>

The undersigned finds that the ALJ's findings and ultimate decision were not based on substantial evidence. In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE# 23, 3/17/2020) is **GRANTED** and the Defendant's Motion for Summary Judgment (DE# 24, 4/16/2020) is **DENIED**. The decision of the Commissioner denying benefits to the plaintiff is **REMANDED** under sentence four of 42 U.S.C. § 405(g) to the

Commissioner so that the Administrative Law Judge can fully and fairly develop the record or contact the plaintiff's treating physician.

DONE AND ORDERED, in Chambers, this 24th day of September, 2020.

CHIEF U.S. MAGISTRATE JUDGE
JOHN J. O'SULLIVAN